J2SVHALS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        15 CR 825 (ALC)

5   ELLIOT HALBERSTAM,

6              Defendant.                SENTENCE

7   ------------------------------x

8                                        New York, N.Y.
                                         February 28, 2019
9                                        3:10 p.m.

10

    Before:
11
                   HON. ANDREW L. CARTER, JR.,
12
                                         District Judge
13

14                        APPEARANCES

15
    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  ANDREW BEATY
         Assistant United States Attorney
18
    STACEY G. RICHMAN
19       Attorney for Defendant

20
    ALSO PRESENT:  AARON SPIVACK, FBI
21

22

23

24

25

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, please state your

3   appearance for the government.

4           MR. BEATY:  Good afternoon, your Honor.

5           Andrew Beaty, for the government.

6           With me at counsel table is Special Agent Aaron

7   Spivack.

8           THE DEPUTY CLERK:  And for the defendant.

9           MS. RICHMAN:  Good afternoon, your Honor.  Pleasure to

10  see you.

11          Stacy Richman, on behalf of Mr. Halberstam.

12          THE COURT:  All right.

13          We are here to impose sentence today in the case of

14  *United States v. Halberstam*.

15          In preparation for today's proceeding, I've reviewed

16  the presentence report, a submission from the government, two

17  victim impact statements, as well as a submission from the

18  defense with eight attachments.

19          Is there anything else that I should have, counsel?

20          MR. BEATY:  No, your Honor.

21          MS. RICHMAN:  No, your Honor.

22          THE COURT:  Defense counsel, have you reviewed the

23  presentence report?  I know from your submissions you have; but

24  have you, in fact, reviewed that with your client?

25          MS. RICHMAN:  I have, your Honor.

J2SVHALS

1         THE COURT:  And Mr. Halberstam, have you reviewed the

2   presence report?

3         THE DEFENDANT:  I have, your Honor.

4         THE COURT:  Defense counsel, other than what's

5   contained in the presentence report, are there any objections

6   to the presentence report other than what's contained in the

7   notations to the presentence report?

8         MS. RICHMAN:  Just as I've submitted it as Exhibit 3,

9   I had written everything to your Honor so that it is all

10  contained within Exhibit 3A.

11        THE COURT:  Okay.

12        Counsel for the government, have you reviewed the

13  presentence report?

14        MR. BEATY:  Yes, your Honor.

15        THE COURT:  Any objections to anything in the report

16  by the government?

17        MR. BEATY:  No, your Honor.

18        THE COURT:  Although I'm no longer required to

19  strictly adhere to the sentencing guidelines in imposing

20  sentence, I am still required to consider the applicable

21  guideline range in imposing sentence.  And to do so, it is

22  necessary that we accurately calculate the guideline sentencing

23  range.

24        The probation report calculates a guideline range of

25  168 to 210 months, based on a total offense level of 35 and

| | |
|---|---|
| 1 | Criminal History Category I.  And I will note that there is a |
| 2 | ten-year mandatory minimum. |
| 3 | Any objection to that guideline calculation by the |
| 4 | government or the defense? |
| 5 | MR. BEATY:  Your Honor, I think, as the Court is |
| 6 | aware, there is a plea agreement in place in this case in which |
| 7 | the parties agreed on a stipulated guidelines range of 135 to |
| 8 | 168 months.  The reason for the difference in calculation is |
| 9 | probation's assessment that an enhancement for the defendant's |
| 10 | role in the offense applied, which raises the guidelines by two |
| 11 | offense levels.  The government submits that the stipulated |
| 12 | guidelines range to which it agreed in the plea agreement is |
| 13 | the appropriate range. |
| 14 | THE COURT:  Okay. |
| 15 | And what's defense counsel's position? |
| 16 | MS. RICHMAN:  The government and defense have |
| 17 | conferred.  And we agree with the government's position as to |
| 18 | the guideline range as set forth in the plea agreement, because |
| 19 | at the time of the offense, the supervision had terminated. |
| 20 | THE COURT:  So to be clear, it is the position of the |
| 21 | government and the defense that that two-level enhancement that |
| 22 | was not contemplated in the plea agreement should not apply; is |
| 23 | that correct? |
| 24 | MR. BEATY:  Your Honor, the government is bound by the |
| 25 | plea agreement in which it agreed with defense that that |

1  enhancement did not apply.

2          THE COURT:  Okay.  Based on the agreement of the

3  parties, I will find that the appropriate guideline range is

4  135 to 168 months, and that's based on a total offense level of

5  33 and Criminal History Category I.

6          Is there any reason I should not adopt the presentence

7  report, counsel for the government or the defense?

8          MR. BEATY:  No, your Honor.

9          MS. RICHMAN:  No, subject to comments that I had

10 submitted to your Honor.

11         THE COURT:  Okay.  I adopt the presentence report.

12         I note that I have the authority to vary from the

13 guidelines; I have the authority to depart from the guidelines.

14 And again, the guideline range is 135 to 168 months.  There is

15 still a ten-year mandatory minimum.

16         I will, at this point, hear from any victims that wish

17 to be heard.

18         Counsel for the government, are there any victims that

19 wish to be heard?

20         MR. BEATY:  Yes, there are.

21         The government would request that in the transcript

22 the names of the victims be redacted out, although they will

23 introduce themselves here in open court.

24         THE COURT:  Okay.

25         MR. BEATY:  Thank you, your Honor.

1          UNIDENTIFIED SPEAKER:  At 13 years old, I was

2    uncertain about matters that concerned so many typical,

3    emerging adolescents.  I was uncertain about as to whether my

4    strained relationship with my brother was worth salvaging; if

5    my sexuality -- or lack thereof at this point -- was cause for

6    concern; if my friends were ones worth preserving, despite

7    being the cause of so much bullying and torment in the past;

8    and if I was merely in an overall place as an emerging

9    teenager.

10         I began seeing Elliot Halberstam for counseling at the

11   Jewish Family Services because of his pristine reputation and

12   renown skills as a social worker.  Week after week I would

13   enter his office to disclose my secrets, my fears, my

14   ambitions, my internal conflicts, and my dilemmas in hopes of

15   find a modicum of psychological relief.

16         As a young child, I was unable to determine what

17   methods of therapy were appropriate; but, in retrospect, I

18   realized that Halberstam's methods were anything but.  He would

19   press me for information about my sexuality, claiming that even

20   the saintliest of his clients had confided their ugliest

21   thoughts with him.  He would constantly steer our conversations

22   to topics which I was uncomfortable discussing.  And when I

23   would not entertain the idea of confiding in him regarding

24   these topics, he would impose a silence that would last for

25   what seemed far longer than any therapy session should last in

1    its entirety.

2         But at that point I was emotionally stranded.  And

3    Halberstam understood this and used it as an opportunity to

4    prey on my vulnerability.  He instilled in me this notion that

5    no other person would ever be able to comprehend my complexity.

6    He relentlessly reminded me that he was the only person who

7    could ever supply me with unfettered support and guidance in my

8    ever-so complicated life.  He had been grooming me since the

9    day I entered his office on day one.

10        Over the span of my time under Halberstam's guidance,

11   out-of-session context evolved from work emails to private

12   emails, from emails to texts, and texts to phone calls that

13   would go on for hours.  He would feign sympathy when I let my

14   guard down, and he would remind me if I were to remain closely

15   acquainted to him, I would soon be able to escape so many of my

16   frustrations, particularly those involving family, community,

17   and academics.

18        After several months of close contact, Elliot gave me

19   a computer on loan.  This computer was being remotely accessed

20   in part by Halberstam, granting him access to my emails, my

21   search history, giving him all the information he needed in

22   order to understand which subjects to prod at and use as

23   leverage to lure me further into his snare.

24        According to Halberstam, the primary obstacle barring

25   me from my freedom was my prudishness; and that my lack of

sexuality and sexual expression was preventing me from properly

adapting to the outside world, which, of course, I would have

at my fingertips if I remained by his side.

He encouraged me to pursue a modeling opportunity that

had presented itself and posed as someone who had ties to the

agency and had offered me this position.  He, together with

this fictional character, pressed me for pictures which were

innocent and just meant to prepare me for my future as a model,

until they were not.

I would pose my objections every time Halberstam

insisted that I take pictures which were just a little more

inappropriate than the last.  But at this point resistance was

futile; he already had content that, if released, would forever

taint my reputation.  Moreover, Halberstam was in a position of

authority at the very same organization that was supervised by

my mother, and I would not jeopardize my family at any cost.

A few weeks later, the demand for pictures evolved

into demand for action.  At first, Halberstam requested that I

record myself engaging in sexual acts, and would give feedback

on these videos, pointing out details of the act that, if done

according to his criticisms, would have improved my sexual

prowess, bringing me one step closer to liberation.

Liberation from what exactly?  At this point I was

entirely unsure.

After countless videos sent by text and email,

Halberstam insisted that a real sexual encounter would be the final step to tapping into my sexuality, and that I would then be able to fend for myself when I would enter the real world.

I vehemently objected at first, as I was already horrified about how far this ordeal had went. But as I protest during through an innumerable amount of phone calls and texts, my objections were shut down. At this point I fully understood his intentions.

His first attempt at breaking through the barrier and ridding me of my prudishness was unsuccessful, to say the least, as I was completely uncapable of remaining aroused in his presence. Halberstam took this failure as an opportunity to reinforce this theory that I was not yet prepared for the real world and insisted that this nightmarish ordeal needed to be reenacted a second time.

The next time he picked me up from school to bring me to a hotel room, he had brought alcohol and Cialis, claiming it would take the edge off and would enable me to be more comfortable in this incredibly perverted and malicious situation. He was more successful this time, but I knew he was not going to stop until he was content with how I acted for and around him; in other words, he was not going to stop.

These exploitations proceeded for months. He had begun taking me to his private practice office to take rehearsal photos and to rid me of my sexual inhibitions for a

modeling career and a glamorous life of independence that, in reality, was never going to come.

Throughout this grooming process, I had lost sight of what exactly I was striving to accomplish before I met him. My initial desire was to be able to find an appropriate means to live a life filled with meaning and healthy relationships, while being within the confines of my own personality and my own comfort zone.

But after years of deceit and manipulation, Halberstam had imposed his own aspirations and twisted desires onto me, knowing good and well that the path he paved for me was nothing less than heinous and self-destructive. Elliot Halberstam had stripped me of the innocence and the virtues of the boy who walked into his office six years ago.

Through the luck of an iCloud snafu, my mother had intercepted snippets of conversations with myself and Halberstam, and was courageous enough to ensure that this would never go on again. However, the months following my mother's discovery ushered in a tidal wave of overwhelming emotional pandemonium that was, in some ways, as difficult to cope with as the abuse itself.

The revelation of the abuse placed such a heavy strain on my relationship with my parents that I believe the bonds we once shared will never be able to be wholly rectified. I also created a great deal of distance from my siblings, as I blamed

1  myself for the shambles my family was left in after this

2  ordeal.  I no longer wanted to socialize with friends or attend

3  work, and I completely isolated myself from the world.

4          After seeing two specialized therapists in the months

5  following the end of the abuse, I, as well as these therapists,

6  believed that I was adequately equipped with the coping

7  mechanisms that would enable me to proceed on my expected

8  trajectory of a year abroad.  Over the course of a few weeks

9  overseas, I began to develop anxiety.  I ignored the symptoms,

10 as I assumed that the panic was merely caused by being away

11 from home.

12         Several months passed, and the anxiety continued to

13 amplify.  I suffered from immense and frequent panic attacks

14 which were set off by triggers associated with the abuse.  And

15 I had developed an eating disorder in hopes of gaining control

16 of myself, while, in reality, I was only spiraling completely

17 out of it.

18         I had returned home after an abbreviated trip of six

19 months overseas to receive extensive counseling and emotional

20 and psychological support.  I had eventually overcome the

21 eating disorder, but the residual impacts of the abuse did not

22 subside.  To this day, I have contemplated suicide, I have

23 developed insomnia, and I don't have any desire to maintain

24 meaningful or intimate relationships with others.  Generally, I

25 have lost motivation for everyday tasks, leaving my social and

1  academic riggers severely damaged.  I remain in treatment for

2  my anxiety and depression to this day.

3         Today, at 20, I still remain uncertain, but not of

4  matters necessarily suited for a 20-year-old, but of heavier

5  matters that countless survivors of abuse and exploitation must

6  grapple with.

7         Do I place trust in my family and my closest friends,

8  knowing that I still fear betrayal and manipulation?  Is the

9  intimacy that I seek for the altruistic purpose of joy and

10  mutual support, or is it merely a superficial validation of

11  both my emotional and physical autonomy?  Do my intentions

12  remain pure in my everyday decisions, or do the residual

13  effects from years of grooming and manipulation still linger?

14         These concerns continue to resonate in my mind,

15  distorting my idea of self-worth and altering my perception of

16  what it means to truly be at ease.

17         THE COURT:  Okay.  Thank you.

18         UNIDENTIFIED SPEAKER:  I stand here before you with

19  the utmost respect for The Honorable Judge Carter, Mr. Beaty,

20  Ivy, Wendy, beloved supporters and survivors of sexual abuse;

21  and our godsend, Agent Aaron Spivack and his team.

22         I've been contemplating for a while on which

23  horrifying aspect of this nightmare I should focus on during

24  the limited time I have to address you here today.  The truth

25  is, is that hours, days, weeks, and months would not be enough

for me to express the trauma and horror that my son and my

family and my own mental health had to endure.

It has been four years of struggling with PTSD, an

eating disorder, dysfunction, trauma, depression, and suicidal

ideation.  I keep asking myself how?  How could it be that I

spent my life bubble-wrapping my most precious commodities, my

children, and still someone was able to penetrate so deeply.

The defense submitted a 36-page report trying to

absolve my son's molester from taking responsibility for his

heinous acts.  He knew exactly what he was doing as he planned,

groomed, and manipulated my son, myself, and my family.  He was

not overtaken by his childhood traumas or his responsibilities

for religion nor from stigma.  He knew exactly what he was

doing.  He wanted what he wanted, and he played everyone around

him until he got it.

He had set forth a selfish, repulsive goal, despite

taking an oath to be a responsible, professional, mental health

therapist, a therapist, one who is supposed to be a trusting

figure, where children like my son sought his help at their

most vulnerable moments.  It was his duty to guide clients into

the light, and not the abyss of hell that we've been through.

Instead of helping innocent children, he used his power of

authority to fulfill his own filthy desires.

Humans have the right to choose, to decide between

right and wrong, to control their evil inclinations, and to get

1  help when they are overwhelmed by immoral, antisocial desires.

2        As a therapist and a director of a mental health

3  agency, and even as a prisoner, according to the defense

4  reports, my son's molester appears to be very competent in

5  knowing how to direct people with mental health issues to seek

6  professional help.  He should have directed himself.  He knew

7  very well that his actions were immoral, unjust, and

8  detrimentally harmful to an innocent and developing young boy.

9        As a social worker, he used to give classes about the

10  harmful effects of child sexual abuse to teachers, camp

11  counsellors, rabbis, and community leaders.  Knowing this, the

12  defendant could have chosen to get professional help, but

13  instead he focused all his energy on grooming, lying, and

14  deceiving my son, whom you just heard from.

15        My son is a hero.  My husband is a man of outstanding

16  courage.  Me, my heart is broken; there is a large part that

17  will never properly heal.

18        And we, the three of us, we too had a choice.  We

19  could have shoved the entire ordeal under the rug and let the

20  perpetrator continue satisfying his nasty desires by preying on

21  countless, countless innocent boys.

22        But we did not do that.

23        We would not allow for even one more life to be

24  jeopardized.  We chose to do the right thing.  Even after

25  experiencing several failed paths, we did not give up.

1          It has been a very, very long, painful road for us,

2     reaching this very moment, now, the moment where you, Judge

3     Carter, you have the power and the authority to allow my son to

4     feel justified, dignified, respected and, as he is supposed to

5     feel, that he is a true hero.

6          It is believed that a man who saves just one life, it

7     is as though he has saved the entire world.

8          Please, please today, my son is deserving of justice

9     for saving the entire world.  Thank you.

10          THE COURT:  Thank you.

11          UNIDENTIFIED SPEAKER:  Your Honor, thank you for the

12     opportunity to address this Court.

13          THE COURT:  You can sit or stand, whatever you're

14     comfortable with.

15          UNIDENTIFIED SPEAKER:  Thank you for the opportunity

16     to address this Court.

17          For six months I've been practicing a speech in the

18     shower every morning that I was going to address the Court

19     until Monday, when I looked at the defense sentencing

20     memorandum submitted by the defense.  It reads like a *Romeo and*

21     *Juliet* love story, a story of forbidden love, somebody finding

22     his soulmate, making himself the victim, the victim in this

23     crime.  This memorandum is insulting and offensive in context

24     and wrought with lies and manipulation content.

25          I want to start off firstly with the defense

1    referencing the Holocaust as an excuse for these crimes.  This

2    is an insult to the six million dead.  If there's one lesson we

3    learn from the Holocaust is that we rebuild after the

4    Holocaust, after destruction; we don't continue to destroy.

5         The defense talks about the perpetrator's conflicts.

6    Your Honor, we are all conflicted, we all come to crossroads in

7    our lives; yet we all have the right to choose our own path.

8    Free choice is what makes us human; it's what differentiates us

9    from the animals.  It does not give us the right to break the

10   law and sociative norms.

11        The defense, in its memorandum, multiple times speaks

12   of the parents' concern that their son was a homosexual.  Your

13   Honor, at no point did my wife or I ever bring this up to the

14   therapist to be addressed.  This was brought in this memorandum

15   specifically to manipulate, to draw a parallel experience to

16   the perpetrator himself in order to create empathy.

17        The defense, in its memorandum, brings in literary

18   references, how the perpetrator was struck by a thunderbolt,

19   suddenly in love.  However, it also references many times

20   nothing is sinister, nothing is nefarious.  It seems to smell

21   more like a different literary reference, Mark Antony speech in

22   *Julius Caesar*; but, of course, Brutus is an honorable man.

23        The perpetrator was the therapist of my son.  He was a

24   child.  He was his patient.  He was entrusted in his most

25   vulnerable state; took advantage of this in so many ways by

1   creating a second persona.  To say that all of this is not

2   nefarious and not sinister is nothing but false.

3          The defense says that the perpetrator is intensely

4   contrite.  He is exceptionally contrite.  He is contrite about

5   being caught, about no longer being perceived as the smartest

6   man in the room, about being the leader, the head of an

7   organization.  He is a monster.  He is a predator, preying on

8   the most vulnerable of our society.

9          To say that love made me do it, it can be an excuse

10  for anything; it can be an excuse for taking objects for theft,

11  for rape.  If so, civility vanishes from our society.  We are

12  human beings again with choices.  And we are responsible for

13  those choices.

14         The defense states that this is not about child

15  pornography or the creation of child pornography for

16  distribution or manipulation of a young person.  That's exactly

17  what this is about.  This is exactly what the offender pleaded

18  guilty to.  It's what he's responsible for.  He cannot plead

19  guilty and then explain it away as puppy love, a minor who was

20  entrusted in his care at his most vulnerable.  He's seeking

21  pity, not penance.

22         Your Honor, the guidelines, as stated by this Court,

23  are for pleading guilty and assuming responsibility.  The

24  offender has done no such thing.  He has not assumed any

25  responsibility for his actions, but continues to attempt to

1    explain in a way and continues to manipulate and attempts to

2    manipulate the Court.

3            I would like to thank AUSA Beaty, Aaron Spivack, Ivy

4    Figueroa, Wendy Olson.

5            The government, in their memorandum, accurately

6    characterizes this impact statement, characterizes the actions

7    of the offender as disturbing, calculated, and extraordinarily

8    damaging.  It was psychologically manipulative.  He was an

9    entrusted psychologist and family friend; uses a second persona

10   to further manipulate and groom.  He's inflicted serious damage

11   on the victim's psychological health, emotional stability, and

12   personal relationships.

13           Your Honor, the one thing I disagree with the

14   government is that he should be sentenced within these

15   guidelines.  These guidelines are for the contrite, for those

16   who accept responsibility.  To be honest, your Honor,

17   cumulatively more man-hours have been served in purgatory by my

18   wife, myself, and my son than the defendant is due to serve in

19   jail.  Continues to be manipulative post plea and deserves

20   beyond the accepted guidelines.

21           I will agree with one thing that the defense wrote in

22   their memorandum, that this case reaches generationally, but

23   not generationally backward, generationally forward.

24           As the defense memorandum is wrought with Bible

25   references, let me make one of my own.  When discussing justice

1    many times in the Bible, a reason is given how justice should

2    be meted; that all the nations should see and hear and they

3    shall transgress no further.  Justice must be served in order

4    to deter further transgressions and to restore civility to

5    society.  Justice must be served so that victims feel it's

6    worthwhile to come forward and that a perpetrator won't be out

7    in less than a decade or even two.  It must be that victims

8    have a voice that mean something so that perpetrators will not

9    continue to destroy our civil society, our institutions, so we

10   can gain trust in our institutions.

11        Your Honor, that is why your Honor is on the bench, to

12   ensure our civil society.  It must be meted out so that

13   everybody will see and hear, and that they will transgress no

14   further; that there is justice and there is reason to come

15   forward; and the pain and the cost involved in making sure

16   justice is done is worth it for all victims.

17        Thank you, your Honor.

18        THE COURT:  Okay.  Thank you.

19        MR. BEATY:  Your Honor, I believe one additional

20   person wishes to speak on the victim's behalf.

21        THE COURT:  You can stand or sit whatever, you feel

22   more comfortable doing, but just make sure you're close to the

23   microphone.

24        UNIDENTIFIED SPEAKER:  I just asked your Honor a

25   little while ago to say a few words.

1          I run a victim advocacy organization in the Orthodox

2     Jewish community that combats child sexual abuse.  And it is a

3     plague in our community.  Just as you see in the media with the

4     Catholic Church and everything going on, the same thing --

5     possibly even worse -- is happening amongst us.  And every day

6     our staff, we try to empower and encourage victims to go

7     forward to the police.  I don't know how many times I have

8     reached out to law enforcement with cases of people that were

9     going to go forward and then they backed out due to pressure

10    and intimidation in the community.  One in probably hundreds

11    actually go forward all the way.

12         This young man, his family went forward.  The pain,

13    the suffering that they went through for the last few years, I

14    know a little bit of the pain of the victim, of the trauma

15    that, till this day, how it affects me and how it affects

16    people.  And I know part of getting closure is the justice that

17    is happening in these courtrooms.

18         But it's not just about the victim; it's about all

19    those other children that could be possible victims.  And

20    that's why the victims that do come forward, they come forward

21    to protect others.  Abusers, child molesters, they don't just

22    have one victim.  They always have more.

23         Your Honor, God gives each one of us responsibilities,

24    certain powers, what they can do, what they can't do.  God put

25    you on this case for a reason, for you to oversee it:  To send

J2SVHALS

1    a strong message to the Orthodox Jewish community that child

2    sexual abuse won't be tolerated.  If you sexually abuse a

3    child, you will be held accountable to the full extent of the

4    law.  You're going to send a message to anybody that's thinking

5    of touching a child, this is what will happen to you.  To the

6    victims that come forward, to know that they will be believed,

7    that the justice system will help them.

8            There's two girls in the crowd that are here from

9    Australia.  They have been going after their abuser in Israel

10   for ten years and they cannot get justice.  Victims in America

11   need to know our justice system will take care of them, will

12   help them, will support them when they come forward.

13           Your Honor, I'm asking you to give the harshest

14   sentence within the guidelines, to send a strong message to

15   both those victims that are out there and to any child abusers

16   out there that this has to end.  Thank you.

17           THE COURT:  Okay.  Thank you.

18           I want to thank the victims for their statements.  I

19   know that this was difficult for them.

20           I'll now hear from the parties regarding any issues

21   they want to raise about the appropriate sentence in this case,

22   starting with counsel for the government.

23           MR. BEATY:  Thank you, your Honor.

24           Nothing I say could be nearly as impactful as what you

25   just heard from the victim and his family.  I would just direct

1   the Court to the complaint in the PSR that lays out these

2   communications in great detail, and otherwise rest on my

3   submission.  The government submits that a guideline sentence

4   is appropriate here.

5          Unless the Court has any questions, I will end with

6   that.

7          THE COURT:  Okay.  Thank you.

8          MR. BEATY:  Thank you, Judge.

9          THE COURT:  Defense counsel.  And defense counsel, I

10  think your mic is a little low; can you use the other mic

11  perhaps?

12         MS. RICHMAN:  Good afternoon, your Honor.  Good

13  afternoon to everyone.

14         And yes, the complainant is indeed a hero, as is his

15  family.

16         In no way, shape, or form was the intent of the

17  defense submission to shirk responsibility, to shade

18  responsibility.  It was, as is the duty of defense counsel, to

19  give the Court a picture of Elliot Halberstam, how he evolved

20  to this place; and how he, as a human being, has harmed

21  another -- in a way, people prefer to be accused of murder than

22  to be accused of this -- and then to do these acts.

23         Please know, I hope that the family should know, most

24  importantly, from the very outset it was Mr. Halberstam's

25  desire to take responsibility fully and completely for his

1   actions.  He'll speak to you in his statement.  And in his

2   statement and as the Court knows from reviewing the sentencing

3   memorandum, Mr. Halberstam himself was also touched as a child.

4   Certainly not to this extent, but it was somebody that trusted

5   him, that he trusted as well.

6           There's a couple of aspects I want to touch upon.

7   There was a document served yesterday by the people from an

8   organization that had asked not to mention the name of.  And

9   please note that that work was mentioned in the presentence

10  report at paragraph 120, that he did indeed report that he had

11  worked for this organization.  And it is clearly pointed out by

12  the letter from the organization that there was nothing

13  sinister and no criminal action would have been taken.

14          In my work with Mr. Halberstam, and Mr. Halberstam has

15  sought to be so painfully honest, that I have learned the

16  details of him coming together with his wife, his relationship

17  with his now brother-in-law, and his moment of when he was so

18  impacted by the complainant that he went forward.

19          The problem here is that this went on for a number of

20  months.  And in Mr. Halberstam's mind, all of this had a finite

21  situation, as the young man was to go somewhere else.

22          And in terms of the concept of creating child

23  pornography, one of the reasons that we settled on the count

24  that we settled on is because none of this was for

25  distribution.  This was, as wrong as it is, for Mr. Halberstam

1   to have gone back onto the path that he was expected to lead.

2   It's known in Yiddish as the *derech*; the correct path, the

3   expected path.

4           Mr. Halberstam is, without question -- it's an

5   entirely unique situation.  In our careers we've come in

6   contact with cases of child molestation of every different kind

7   of dimension.  When I read the complaint, I was like, Oh, my

8   God.  Who am I going to meet?  What is this person?  And I was

9   stunned to come to know the man.

10          And through my discussions with Mr. Halberstam -- and

11  I think the Court has also reflected on the letter of

12  Mr. Askenazi and his work with the community, also on behalf of

13  sexual abuse survivors and people that have had to live

14  closeted lives.  It is, without question, a problem in our

15  community.  But in coming to know Mr. Halberstam, he also came

16  to a place where he recognized his identity and the legitimacy

17  of that orientation.

18          What he did, he agrees, he is here for his punishment.

19  He wants to embrace every directive of the Court.  And make no

20  mistake about it, whatever the sentence of the Court is, this

21  is something that will go beyond even our court, because upon

22  his release, whenever that may be, there will be the state

23  proceedings.  And we will have further hearings, he will be

24  labeled, he will be supervised for the rest of his life in all

25  likelihood.  So this is not a sentence of merely this Court,

1    but it is the expansion also by what New York State and every

2    state in our union now provides as well.

3            What is saying to me about Mr. Halberstam and the

4    history that he comes from, this is not an offense upon

5    reviewing the Holocaust. Mr. Halberstam's father is here, is

6    indeed a surviver; his mother is a survivor of the war. And I

7    have unbelievably found there seems to be so much abuse within

8    the households from that dyspeptic growth of people that didn't

9    have parents and then they reign it down upon their children.

10   It should have been a time of rebuilding; it should have been a

11   time of expansion for all of the future.

12           And in this particular realm, this cleaving onto

13   religion and the very strict mores given to us by religion for

14   those that wish to remain within the orthodox sphere, this

15   particular case, aspects of Hasidism. There are certain things

16   that are simply not accepted, and they are buried and they are

17   put under the rug, and that's what provides for this. And

18   there needs to be a voice for both the victims and the victims

19   on the people that also abuse that have been sequestered and

20   have not been able to express themselves and these

21   peculiarities of our psyches evolve.

22           In every person's mind there are dark spots; and, yes,

23   we have choice. And he made all of the wrong choices here.

24   And it is if he has awoken as well, and he wishes to go forward

25   and only redeem himself. He recognizes the pain, he'll speak

to that.  He recognizes the pain not only to the complainant, but also to the family.  And he will pain himself every day, as he has on each and every day.

This is not a referendum on abuse of children.  It's wrong.  I personally know it's wrong.  It's wrong.  There's no justification for it.

What the sentencing memorandum is to do is to understand how this one individual, who, by every other mark of his existence, was the child that wanted to please, that wanted to accommodate, that wanted to do the right thing, and he so has horribly done the wrong thing.  And it was important for the Court to understand how this man, who is a good man, who has done something horrible, comes before the Court today.

In contemplating the aspects of 18 U.S.C. 3553(a), we obviously have a litany of what we are to attend to in sentencing and in consideration of the individual.  And with regard to this aspect, to protect the public from further crimes of this defendant, I think this defendant is awake and aware.  And as each doctor had reviewed him –– Dr. McCarthy said he was a low risk of recidivism; Dr. Krueger felt he was a remote risk of recidivism because of his desire to engage in treatment.

And, in fact, he has demonstrate what positive he can contribute, even within the horrors that MDC has exhibited over these last months and years.  He has tried to counsel others.

Yes, he has skills; yes, he employed those skills wrongly in
this situation.  But he has the power to engage them properly
for others.  He's instructed others; he's been recognized for
that.

In terms of the seriousness of the offense and to
promote respect for the law and provide just punishment for the
offenses, in the context of this individual, we all agree that
the abuse is wrong.  It has had a cataclysmic impact upon this
person and this family.

But within the context of how we came to this place,
and what he can do to go forward, and the respect for the law
that will be carried forward in the rating of at least a level
2 -- perhaps a level 3 -- sexual offender, Mr. Halberstam will
wear the scarlet letter of this, as well, for his entire life.
And with that he carries the pain of the recognition of what he
has done to someone that I don't wish to offend, but he truly
did love, as wrong as that love was.  The creation of the third
party had meant to be a positive; it was meant to show you can
go in another direction, you can have another choice.  And then
indeed Mr. Halberstam took the choices unto himself.

I wanted the Court to understand evolution of an
individual that comes to this place, how he comes to this
place.  What he still can't explain to himself and he'll
comment upon is that how did he not pull himself away when it
was his job to counsel others?  And for this is the need for

1  therapy going forward, something that's not available to us in

2  our facilities.

3          In reflecting upon the sentence for Mr. Halberstam,

4  your Honor, my request is that you sentence Mr. Halberstam

5  closer to the mandatory minimum.  I recognize that there is a

6  range.  I recognize the pain of all that have come here.  But

7  there is a pain that created this situation as well, and that

8  needs to be spoken to also.

9          Most respectfully, your Honor, I have come to know a

10  man that has shocked me.  And I was very happy when the

11  government agreed to finally meet with him, because sensitized

12  only by the act itself, it is hard to understand him as a human

13  being.  But he is indeed a human being.  And that which is

14  sufficient, but not greater than necessary is, I recommend to

15  the Court, the minimum.

16          THE COURT:  Okay.

17          Mr. Halberstam, if you'd like to address me, now is

18  your opportunity.  You don't have to say anything.  But if

19  you'd like to, you may address the Court.

20          Now, Mr. Halberstam, I see you standing to show

21  respect for the Court.  While I appreciate that, why don't you

22  have a seat and you can speak into the microphone and I can be

23  sure to hear everything that you have to say.

24          THE DEFENDANT:  Your Honor, I must begin by

25  reiterating my contrition for the distress and the pain that I

1   have inflicted on the complainant and his family.  These are

2   not words of mere platitude; I am aware that my deceitful

3   actions have had a lasting negative impact, causing tremendous

4   anguish.  And I know that I must pay for my crime and its

5   consequences.

6          I want the family and, most importantly, the

7   complainant to know that during my proper work, I did not have

8   a focus upon him, nor did I strategize for years to do what I

9   know is terrible.

10         My transgressions began from a true concern that he --

11  and I shall not say his name out of respect for all of you.  I

12  have no right to utter it and for fear that there may be a

13  transcript of this proceeding.  This began from a true concern

14  the complainant have a full and good life not restricted by

15  community mores.  Homosexuality is not an abomination.  In our

16  community, however, it is silently oppressed.  This lack of

17  understanding and acceptance provides a haven to abuses.

18         I am wrong for what I have done to you, to your son,

19  to your family, and to the community.  I am wrong for not

20  pulling myself from the rabbit hole of obsession for this one

21  person for whom I was directed to make appear and be mature in

22  order to skip a grade.  I did not seek an adolescent; I saw him

23  as a young man, and I know that all that I did was wrong.

24         I want to be a positive in ensuring there is a voice

25  and light to protect others, to serve humanity in any way I may

1  within the confines of what I know will be lifelong

2  restrictions.  I am willingly subject to all directives of the

3  Court, the community and, most importantly, the family.  If

4  there is anything I may answer or do to correct my hurt, I

5  shall do so as permitted by your Honor.

6          In addition to directly creating a victim through my

7  actions, I have also hurt many people in my life.  My three

8  beautiful children have had to live without their father for

9  the past three years and three months and however long the

10 Court directs.  They only speak to me briefly each week.  I

11 have also deprived my elderly and unwell parents of their son,

12 and caused shame and embarrassment to my wider family, friends,

13 and community.

14         Your Honor, I cannot excuse my behavior.  On

15 reflection, I do not understand how I did what I did to

16 another.  I was abused as a child.  I know the confusion, and

17 yet I repeated that pain to another.

18         I want to dedicate myself to properly helping others;

19 that is who I was meant to be and who I believed I was and who

20 I do believe I am.  Not a day goes by without me reflecting on

21 my actions and praying for forgiveness.

22         As I sit before you today, I beg for your mercy and

23 the chance to be able to redeem myself and pay my debt to

24 society.  I pray to God today and every day for healing for the

25 complainant and his family, for compassion and forgiveness.

1          I implore you, please, to give me a second chance,

2    understanding, and leniency when pronouncing my sentencing

3    today.  I will not disappoint this Court or our community

4    again.  My contrition is consuming.  I can never apologize

5    enough nor correct the past.

6          I deeply regret the impact that I had upon you.

7          Thank you.

8          THE COURT:  Okay.  I'll be back.

9          (Recess)

10          THE COURT:  Counsel, is there any reason why sentence

11    should not be imposed?

12          MR. BEATY:  No, your Honor.

13          MS. RICHMAN:  No, your Honor.

14          THE COURT:  Mr. Halberstam, are you satisfied with

15    your legal representation up to this point?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  I have considered all of the factors in 18

18    U.S.C. 3553, including the nature and circumstances of the

19    offense and the history and characteristics of the defendant.

20    While Mr. Halberstam has certainly had a very difficult life

21    and experienced a lot of trauma, that certainly does not excuse

22    or justify what he has done here.

23          I've considered the need to reflect the seriousness of

24    the offense, to promote respect for the law, to provide just

25    punishment for the offense, to afford adequate deterrence to

1    criminal conduct, to protect the public from further crimes of

2    the defendant, as well as to provide the defendant with needed

3    educational or vocational training, medical care, other

4    correctional treatment in the most efficient manner.  I've

5    considered the kinds of sentences available.  I've considered

6    the sentencing guidelines, as well as the other factors in

7    3553.

8            As defense counsel indicated, there are many factors

9    in Mr. Halberstam's past that make him the person that he is

10   today.  But I would note that this criminal conduct did not

11   happen because of the Holocaust, this criminal conduct did not

12   happen because of Mr. Halberstam's religion, this did not

13   happen because of his homosexuality.  His homosexuality might

14   lead him to have sex, consensual sex, with another adult male.

15           The victim in this case was not an adult; the victim

16   was a child.  Not only was the victim a child, the victim was a

17   child who sought help from a therapist.  The victim was in a

18   very vulnerable, emotional state.  And one of the things that

19   makes this case even more troubling is that often with victims

20   of sexual abuse, we recommend that they get therapy.  For this

21   complainant, he will associate therapy not only with a vehicle

22   for helping him deal with trauma, but as the context within

23   which the trauma took place.

24           I have the authority to depart from the guidelines

25   upwardly or downwardly.  I have the authority to vary from the

1    guidelines upwardly or downwardly, and I choose not to do so.

2    I do think that a sentence within the guideline range is

3    appropriate in this case.  But I do believe that a sentence

4    toward the high end of the range is appropriate.

5            Again, I want to thank the victims for their testimony

6    here today.

7            I will impose a term of custody of 165 months.  I will

8    impose a term of supervised release of ten years.  I will not

9    impose a fine.

10           What's the government's position on restitution at

11   this point?

12           MR. BEATY:  Yes, your Honor.

13           The government will provide a proposed restitution

14   order within the 90 days provided by the statute.

15           THE COURT:  What's the government's position on

16   forfeiture?

17           MR. BEATY:  No forfeiture, your Honor.

18           THE COURT:  I will impose the $100 special assessment.

19           In terms of supervised release, I will impose the

20   mandatory conditions of supervised release; that Mr. Halberstam

21   not commit another federal, state, or local crime; that he must

22   not unlawfully possess a controlled substance; he is to refrain

23   from any unlawful use of a controlled substance.  He must

24   submit to one drug test within 15 days of release from

25   imprisonment, and at least two periodic drug tests thereafter.

1   He must cooperate in the collection of DNA as directed by the

2   probation officer.  He must make restitution.

3       I will impose the standard conditions of supervised

4   release as set forth in the presentence report, standard

5   conditions 1 through 11, as well as standard condition 13.  I

6   will not impose standard condition number 12 because standard

7   condition number 12 has been ruled improper by the Second

8   Circuit.

9       In terms of special conditions, I will impose the

10  following special conditions:  That Mr. Halberstam provide the

11  probation officer with access to any requested financial

12  information.  He must not incur new credit charges or open

13  additional lines of credit without the approval of the

14  probation officer unless he is in compliance with the

15  installment payment schedule.  He must not have contact with

16  the victims in this case.  This includes any physical, visual,

17  written, or telephonic contact with such persons.

18  Additionally, he must not directly cause or encourage anyone

19  else to have such contact with the victims.

20      The defendant shall undergo a sex-offense-specific

21  evaluation and participate in an outpatient sex offender

22  treatment and/or outpatient mental health treatment program

23  approved by the U.S. Probation Office.  He shall abide by all

24  rules, requirements, and conditions of the sex offender

25  treatment program, including submission to polygraph testing

and refraining from accessing websites, chat rooms, instant
messaging or social networking sites, to the extent that the
sex offender treatment and/or mental health treatment program
determines that such access would be detrimental to the
defendant's ongoing treatment.

The defendant will not view, access, possess, and/or
download any pornography involving adults unless approved by
the sex-offender-specific treatment provider.  He must waive
his right of confidentiality and any records or mental health
assessment and treatment imposed as a consequence of this
judgment to allow the U.S. Probation Office to review the
course of treatment in progress with the treatment provider.

He must contribute to the cost of services rendered
based on his ability to pay and the availability of third-party
payments.  I authorize the release of available psychological
and psychiatric evaluations and reports, including the
presentence investigation report, to the sex offender treatment
provider and/or mental health treatment provider.

The defendant must not have deliberate contact with
any child under 18 years of age unless approved by the U.S.
Probation Office.  He must not loiter within 100 feet of places
regularly frequented by children under the age of 18, such as
schoolyards, playgrounds, and arcades.

The defendant must not view and/or access any web
profile of users under the age of 18.  This includes, but is

not limited to, social networking websites, community portals,

chat rooms, or other online environment audiovisual messaging,

etc., which allows the realtime interaction with other users,

without prior approval from the probation officer.

The defendant shall submit his person and any

property, residence, vehicle, papers, computer, and other

electronic communication or data storage devices or media and

effects to a search at any time, with or without a warrant, by

any law enforcement or probation officer with reasonable

suspicion concerning violations of a condition of supervised

release or unlawful conduct by the person and by any probation

officer in the lawful discharge of the officer's supervision

functions.

The defendant shall permit the U.S. Probation Office

to install any application or software that allows it to survey

and/or monitor all activity on any computers, automated

services or connected devices that he will use during the term

of supervision and that can access the Internet.  The U.S.

Probation Office is authorized to install such applications for

or software.  Tampering with or circumventing the U.S.

Probation Office's monitoring capabilities is prohibited.  To

ensure compliance with the computer monitoring condition, the

defendant must allow the probation officer to conduct initial

and periodic unannounced examinations of any devices that are

subject to monitoring.

J2SVHALS

1          I will impose the other conditions set forth in that

2     paragraph on page 37 of the presentence report.

3          Are there any open counts?

4          MR. BEATY:  There are, your Honor.

5          At this time the government moves to dismiss the two

6     remaining open counts.

7          THE COURT:  Okay.  That is granted.

8          Is there anything else, before I advise the defendant

9     of his right to appeal, from the government or the defense?

10          MR. BEATY:  Your Honor, the government would just

11     request that the Court remind the defendant of his obligation

12     to register under the federal Sex Offender Registration and

13     Notification Act.  The conditions are set forth on page 5 of

14     the plea agreement.

15          THE COURT:  Okay.

16          Anything else from the defense?

17          MS. RICHMAN:  Yes, your Honor.

18          With regard to -- we're counseled now with regard to

19     special conditions of supervised release, to advise the Court

20     of our concerns.  So one of those concerns is with regard to

21     deliberate contact with any child --

22          THE COURT:  If the concern is about whether or not the

23     defendant can have contact with his children --

24          MS. RICHMAN:  Yes.

25          THE COURT:  -- I believe that that will be approved by

1    the probation department.

2            MS. RICHMAN:  If the Court will simply make note that

3    it is one of the concerns, because we have had issues where

4    this becomes something that then leads to another aspect of

5    litigation.  And so that was my simple concern.

6            THE COURT:  Okay.

7            Anything from the government on that?

8            MR. BEATY:  The government takes no position.  I think

9    it's generally assessed by probation.  The government takes no

10   position.

11           THE COURT:  Okay.

12           MS. RICHMAN:  One of the concerns is during the term

13   of the incarceration, the children may want to call him, speak

14   to him.  And so we don't want to even offend the direction of

15   the Court.  And so if we could have a statement as to that so

16   that we have direction, your Honor.

17           THE COURT:  Yes, counsel.

18           MR. BEATY:  I believe the conditions of supervised

19   release wouldn't be imposed while the defendant is in prison.

20   The government would have no problem with just a clarification

21   from the Court that these would not limit his children from

22   visiting or communicating with him while he is in prison.

23           THE COURT:  Okay.  That is my understanding as well,

24   that these terms of supervised release would not kick in until

25   he's actually released.  And I believe that the children that

1   he has will all be over the age of 18 by then or close to it.

2              MS. RICHMAN:  They should be, your Honor.

3              THE COURT:  Okay.

4              Mr. Halberstam, you are required to register under the

5   Sex Offender Registration Notification Act, do you understand

6   that?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Anything else before I advise the

9   defendant of his right to appeal, counsel for the government or

10  the defense?

11             MR. BEATY:  No, your Honor.  Thank you.

12             MS. RICHMAN:  No, your Honor.

13             THE COURT:  Mr. Halberstam, you have a statutory right

14  to appeal.  There are time constraints on your ability to file

15  the notice of appeal.  You should talk to your lawyer about

16  that.

17             If you cannot afford to hire an attorney to help you

18  prosecute the appeal, the Court would give you an attorney for

19  free.

20             Do you understand?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  Again, I want to thank the victims for

23  their statements.  I hope that the complainant in this case

24  fully realizes that there is much more to him than the worst

25  thing that has happened to him.

1          And similarly, I hope that the defendant understands

2    that he is more than the worst thing that he has done.

3          We're adjourned.

4                              *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25